721 F.2d 77
 33 Fair Empl.Prac.Cas. 187,
32 Empl. Prac. Dec. P 33,922
Valerie A. CRAIG, Appellee-Cross-Appellant,
v.
Y & Y SNACKS, INC. a/k/a Popcorn Supply Co., Appellant-Cross-Appellee.
 Nos. 82-1486, 82-1508.
 United States Court of Appeals,
Third Circuit.
 Argued June 9, 1983.
Decided Nov. 7, 1983.
Rehearing and Rehearing En Banc Denied Dec. 2, 1983.
 
 Howard Wallner (argued), Germaine Ingram (argued), Community Legal Services, Inc., Philadelphia, Pa., for appellee-cross-appellant.
 Wendy L. Tice-Wallner, San Francisco, Cal., for appellant-cross-appellee.
 Before SEITZ, Chief Judge, SLOVITER, Circuit Judge and SAROKIN, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Before us are cross-appeals following a judgment for the employee in an action alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, Sec. 701 et seq., as amended, 42 U.S.C. Sec. 2000e et seq. The district court found that the plaintiff below was fired by her supervisor for rebuffing his sexual advances. The employer, while not disputing plaintiff's account of events leading up to her dismissal, maintains that she was discharged for independent, legitimate reasons. On the separate issue of damages, the employee cross-appeals from the deduction of unemployment compensation from her gross back pay award.
 
 I.
 Facts and Procedural History
 
 2
 Valerie A. Craig worked for Y & Y Snacks, Inc. in the packaging department, where popcorn and other snack foods were packed and bagged in a small assembly-line operation. Her supervisor at all relevant times was Harris Hughes, who, by his own testimony and that of the company president, exercised "complete discretion" over hiring, firing, scheduling and disciplining employees in the department.
 
 
 3
 On July 15, 1978, Hughes joined Craig and several other employees for drinks after work, and then gave Craig a lift. In the car Hughes proposed that they go to Craig's house for the purpose of sexual relations. Craig refused. Hughes persisted, Craig persisted in refusing, and before he dropped her off Hughes said he would "get even" with her. Craig's account of the events of July 15 stand uncontradicted.
 
 
 4
 The following week Hughes was noticeably cool to Craig and several times refused to excuse her to use the restroom, a departure from his previous practice. On July 25 Craig did not report to work, having left a message before the shift started that she was ill and had gone to her doctor's office. She returned the next day with a doctor's note to find that Hughes had dismissed her.
 
 
 5
 Craig testified, and the district court found, that she immediately told David Yaffe, Y & Y's President, of her discharge and of her suspicion that it was motivated by the events of July 15. Yaffe told her he would look into the matter, but when she called him several days later he said that her record justified her dismissal and that he would not reinstate her. Yaffe testified he knew nothing of the incident until months later, when he received a complaint that Craig had filed with the Equal Employment Opportunity Commission. The district court credited Craig's account regarding notice, and determined liability in her favor. The court subsequently issued an order directing Craig's reinstatement, enjoining Y & Y from making future reprisals against Craig, and granting Craig back pay, reduced by the amount of interim earnings and unemployment compensation that she received after her dismissal.
 
 II.
 Liability
 
 6
 Y & Y's quarrel with the district court's finding of liability is twofold. First, Y & Y contends that Craig failed to meet her burden of proof. Second, Y & Y claims that the court failed to apply the requirement of Tomkins v. Public Service Electric & Gas Co., 568 F.2d 1044 (3d Cir.1977), that the employer have actual or constructive knowledge of the harassment before it may be held liable.
 
 
 7
 1. We turn briefly to the first point, essentially a sufficiency-of-the-evidence question. Our scope of review is quite narrow. In sexual harassment cases, where there are frequently serious credibility issues, we are bound to accept the trial court's findings, as we are in all Title VII cases, unless they are clearly erroneous. Henson v. City of Dundee, 682 F.2d 897, 906 (11th Cir.1982); Bundy v. Jackson, 641 F.2d 934, 950 (D.C.Cir.1981); cf. Croker v. Boeing Co., 662 F.2d 975, 993-94 (3d Cir.1981) (Title VII racial discrimination claim); McNeil v. McDonough, 648 F.2d 178, 180 (3d Cir.1981) (same); Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 400 (3d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977) (sex discrimination in job classification).
 
 
 8
 The allocation of the burden of proof in a Title VII case is well settled; the Supreme Court established the standard in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and reaffirmed it recently in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The district court followed the McDonnell Douglas/Burdine regimen closely. It found Craig met her burden of establishing by the preponderance of the evidence a prima facie case, a burden the Court characterized in Burdine as "not onerous." Id. at 253, 101 S.Ct. at 1094. The district court found that Craig's dismissal by Hughes was retaliatory. The court, after referring to our decision in Tomkins v. Public Service Electric & Gas Co., supra, also found that Y & Y had both actual and constructive notice of Hughes' actions.
 
 
 9
 The court found that the defendant articulated a legitimate, nondiscriminatory reason for discharging Craig. Craig's work record was less than exemplary. Though Hughes testified that she was an "outstanding employee" in other respects, she had been absent and tardy many times in the months before her dismissal. Hughes, in the meantime, had received instructions from Yaffe to improve attendance in his department because frequent absences were causing production problems. Under the Supreme Court's decisions, Craig was therefore required "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093 (citations omitted).
 
 
 10
 The district court concluded Craig proved pretext by showing that she was never given a three-day suspension before discharge, notwithstanding Hughes' testimony that the employer's practice was to make such a suspension a mandatory predicate for the ultimate sanction of discharge. This finding is amply supported by the fact that Y & Y, while conceding that a suspension would be a matter of record, was unable to produce any record of such a suspension. This led the court to conclude that notwithstanding the stated reason of further absence Hughes terminated Craig "for the actual reason that this was a device to get even" (emphasis added). The district court thereupon found "as a fact and conclude[d] as a matter of law that a discharge which might otherwise have been legitimately supportable was on this record pretextual and in violation of Title VII." We have examined the record and find no error.
 
 
 11
 2. Y & Y complains next that the district court failed to follow this court's ruling in Tomkins v. Public Service Electric & Gas, supra. In Tomkins, the district court, characterizing sexual harassment as an "abuse of authority ... for personal purposes" outside the scope of Title VII, had dismissed the employee's complaint. In reversing the dismissal and directing reinstatement of the complaint, Judge Aldisert, in a seminal opinion on the issue of sexual harassment, distinguished between "complaints alleging sexual advances of an individual or personal nature" and "those alleging direct employment consequences flowing from the advances", which do constitute Title VII violations. He stated two elements are necessary to find a violation of Title VII: "first, that a term or condition of employment has been imposed and second, that it has been imposed by the employer, either directly or vicariously, in a sexually discriminatory fashion." 568 F.2d at 1048.
 
 
 12
 Y & Y suggests that Tomkins imposed a requirement that an employer have actual or constructive knowledge of the sexual harassment at the time the advance was made. Y & Y Brief at 13. Nothing in Tomkins imposes such an unreasonable burden on an employee. In the relevant, and oft-quoted, language, the court stated:
 
 
 13
 Applying these requirements to the present complaint, we conclude that Title VII is violated when a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee's job status ... on a favorable response to those advances or demands, and the employer does not take prompt and appropriate remedial action ....
 
 
 14
 568 F.2d at 1048-49 (emphasis added). As the Tomkins opinion noted, the complaint filed in that case alleged that the plaintiff's employer "either knowingly or constructively, made acquiescence in her supervisor's sexual demands a necessary prerequisite of, or advancement in, her job." Id. at 1046. The holding on appeal was that these allegations, if proven, would establish a Title VII violation.
 
 
 15
 The district court in this case found that Yaffe, Y & Y's President, had actual notice of the harassment immediately after the discharge, and failed to take adequate remedial steps. Actual knowledge at the time of the employment decision at issue satisfies the Tomkins ruling.
 
 
 16
 Furthermore, when a supervisor who has plenary authority over hiring, discipline and dismissal makes an employment decision, that decision may be imputed to the employer. Title VII itself defines "employer" to include "any agent of such a person." 42 U.S.C. Sec. 2000e(b). It is widely recognized in racial discrimination cases that an employer is liable as a principal for Title VII violations. E.g., Flowers v. Crouch-Walker Corp., 552 F.2d 1277, 1282 (7th Cir.1977). See also Anderson v. Methodist Evangelical Hospital, Inc., 464 F.2d 723, 725 (6th Cir.1972); Calcote v. Texas Educational Foundation, Inc., 578 F.2d 95, 98 (5th Cir.1978); Friend v. Leidinger, 588 F.2d 61, 69 (4th Cir.1978) (Butzner, J., concurring and dissenting). No different rule is appropriate in sexual harassment claims as long as the distinction between purely personal conduct and conduct having direct employment consequences set forth in Tomkins is observed. See Note, Sexual Harassment and Title VII: The Foundation for the Elimination of Sexual Cooperation as an Employment Condition, 76 Mich.L.Rev. 1007, 1025-27 (1978). See generally 1 Larson, Employment Discrimination Sec. 41.63 (1983 & Supp.1983).
 
 
 17
 It is also the prevailing view in other circuits that employer liability follows when the supervising employee has broad authority over employment decisions. See Waks & Starr, Sexual Harassment in the Work Place: The Scope of Employer Liability, 7 Employee Relations L.J. 369, 377-78 (1981). See, e.g., Henson v. City of Dundee, 682 F.2d 897, 910 (11th Cir.1982) (employer strictly liable for sexual harassment by supervisors that results in "tangible job detriment"); Miller v. Bank of America, 600 F.2d 211, 213 (9th Cir.1979) (respondeat superior applies to harassment by supervisor authorized to hire, fire, discipline or promote, even if harassment violates company policy); Barnes v. Costle, 561 F.2d 983, 993 (D.C.Cir.1977) (employer generally liable for Title VII violations "occasioned by discriminatory practices of supervisory personnel"); see also Ferguson v. E.I. duPont de Nemours and Co., 560 F.Supp. 1172, 1198-99 n. 62 (D.Del.1983).
 
 
 18
 We conclude that the imputation of knowledge to an employer in situations, such as this one, in which an offending supervisor has unbridled authority to retaliate against an employee is in accord with Tomkins. To hold otherwise would vitiate the reference to "constructive notice" in Tomkins and would lead to incongruous results. It would compel an employee who is subjected to a supervisor's sexual advances to notify the chief executive officer of each incident in order to preserve the employee's rights in the event of future retaliation. It would also, as the district court commented, permit an employer to insulate itself from Title VII liability "by sealing off its ultimate executive officials from those with the fullest form of day to day operational authority to govern at the plant level." We do not believe that this course is mandated by Tomkins, or was envisioned by Congress when it enacted the Equal Employment Opportunity Act.
 
 III.
 Back Pay Determination
 
 19
 In her cross-appeal, Craig contends the district court erroneously deducted unemployment benefits from her back pay award under Title VII. This issue, which we have not previously addressed,[1] has divided the circuits that have considered it.
 
 
 20
 The Eleventh, Ninth and Fourth Circuits have recently adopted the rule that there should be no deduction for unemployment benefits from a Title VII back pay award. See Brown v. A.J. Gerrard Manufacturing Co., 715 F.2d 1549, 1550 (11th Cir.1983) (in banc) (per curiam); Kauffman v. Sidereal Corp., 695 F.2d 343, 346-47 (9th Cir.1982) (per curiam); EEOC v. Ford Motor Co., 645 F.2d 183, 195-96 (4th Cir.1981), rev'd on other grounds, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721, adhered to original position on remand, 688 F.2d 951, 952 (4th Cir.1982) (per curiam). Contra Merriweather v. Hercules, Inc., 631 F.2d 1161, 1168 (5th Cir.1980); EEOC v. Enterprise Association Steamfitters Local No. 638, 542 F.2d 579, 592 (2d Cir.1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); Satty v. Nashville Gas Co., 522 F.2d 850 (6th Cir.1975) (without discussion), aff'd in part, vacated in part on other grounds, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977); Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir.1969).
 
 
 21
 The district court here, after concluding that the proper remedy was reinstatement and back pay, including 10% prejudgment interest, reduced this amount by unemployment compensation to avoid "something that would be in the neighborhood of unjust enrichment." The court reasoned, "I see no reason in the statute and the equitable principles that inform it that should require the defendant to reimburse the plaintiff for sums which she has, by society's other devices, already received."
 
 
 22
 Nothing in the statutory language, the legislative history, or the case law is clearly dispositive of the issue raised by plaintiff Craig on cross-appeal. The statute does provide for a deduction from a back pay award for "interim earnings" or "amounts earnable with reasonable diligence." 42 U.S.C. Sec. 2000e-5(g). Thus, a duty to mitigate damages is incorporated. But the statute makes no mention of unemployment compensation, and the legislative history does not specifically discuss such benefits.
 
 The relevant statutory text is as follows:
 
 23
 If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.
 
 
 24
 42 U.S.C. Sec. 2000e-5(g).
 
 
 25
 Although the issue is extremely close and one over which reasonable persons could differ, we conclude that unemployment benefits should not be deducted from a Title VII back pay award for the following reasons:
 
 
 26
 (1) We begin with the statutory language. Section 2000e-5(g) explicitly provides that interim earnings and amounts earnable with reasonable diligence must be deducted from back pay otherwise allowable. If Congress intended other deductions, it could have so provided. Its failure to do so must be given some effect by the courts.
 
 
 27
 (2) Although the legislative history of Title VII does not specifically address whether unemployment compensation is to be regarded as deductible "interim earnings", Congress was undoubtedly aware that under the National Labor Relations Act (NLRA) unemployment benefits are not deducted from back pay awards. The Supreme Court in Albemarle Paper Co. v. Moody, 422 U.S. 405, 419-22, 95 S.Ct. 2362, 2372-2374, 45 L.Ed.2d 280 (1975), noted that Congress modeled Title VII's back pay provision on that of the NLRA. Indeed, it was for that reason that the Court held back pay was normally to be awarded under Title VII absent special circumstances, relying on the NLRB's practice of awarding back pay. Thus, in analyzing the deductibility of unemployment benefits, we may reasonably turn for guidance to the practice under the NLRA.
 
 
 28
 The NLRB's refusal to deduct unemployment compensation from back pay was upheld in NLRB v. Gullett Gin Co., 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951). One of the bases relied on by the Court was the fact that when Congress amended the NLRA in 1947, the Board had been following this practice for many years. Thus, the Court concluded "by reenacting without pertinent modification [the back pay provision], Congress accepted the construction placed thereon by the Board and approved by the courts." Id. at 366, 71 S.Ct. at 340-341. Since the Title VII back pay provision was based on the NLRA's, we may, by analogous reasoning, impute a similar construction to Congress.
 
 
 29
 We recognize that the NLRA back pay provision does not contain the "interim earnings" deduction language contained in Title VII. It is clear, however, from the Gullett Gin decision that, in fact, the Board does deduct "earnings of employees from other employment during the back pay period and also sums which they failed without excuse to earn." Id. at 363, 71 S.Ct. at 339 (citations omitted). Therefore, in practice, under the NLRA, and by statute under Title VII, interim earnings must be deducted. Given the parity between the back pay remedies in both statutes suggested by the Supreme Court, it follows that the NLRB's practice not to deduct unemployment compensation from the back pay award, notwithstanding its deduction of interim earnings, counsels a similar construction of Title VII. Brown v. A.J. Gerrard Manufacturing Co., 715 F.2d at 1550-51; see also EEOC v. Ford Motor Co., 645 F.2d at 195-96.
 
 
 30
 (3) Unemployment compensation most clearly resembles a collateral benefit which is ordinarily not deducted from a plaintiff's recovery. Under the collateral benefit rule, payment which a plaintiff receives for his or her loss from another source is not credited against the defendant's liability for all damages resulting from its wrongful or negligent act. Restatement (Second) of Torts Sec. 920A(2) (1979); 3 L. Frumer, R. Benoit & M. Friedman, Personal Injury Sec. 4.03 (1965); see also Smith v. United States, 587 F.2d 1013, 1015 (3d Cir.1978); Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 179-180 & n. 3 (3d Cir.1977). In addition to unemployment compensation, payments under Social Security or welfare programs and similar benefits have been treated as collateral. See, e.g., Titchnell v. United States, 681 F.2d 165 (3d Cir.1982) (Medicare); Smith v. United States, supra (Social Security); Varlack v. SWC Caribbean, Inc., supra (government-reimbursed medical and rehabilitative expenses); see also 3 L. Frumer, R. Benoit & M. Friedman, supra, at Sec. 4.03; Restatement (Second) of Torts, supra, at Sec. 920A comment c(3).
 
 
 31
 The rationale for a rule that at first glance may appear to provide an inequitable double recovery is that a wrongdoer should not get the benefit of payments that come to the plaintiff from a source collateral to the defendant. See Kauffman, 695 F.2d at 346-47 (quoting Gullett Gin, 340 U.S. at 364, 71 S.Ct. at 339-340); Ford Motor, 645 F.2d at 195-96. There is no reason why the benefit should be shifted to the defendant, thereby depriving the plaintiff of the advantage it confers. See Kassman v. American University, 546 F.2d 1029, 1034 (D.C.Cir.1976) (per curiam). This policy also may have somewhat punitive undertones, as it focuses on what the defendant should pay rather than on what the plaintiff should receive. See Restatement (Second) of Torts, supra, at Sec. 920A comment b; 2 F. Harper & F. James, The Law of Torts, Sec. 25.22 at 1344 (1956 & Supp.1968).[2] Furthermore, although it appears to provide double recovery, in fact that is not the inevitable result. Often insurers have subrogation rights, and in some circumstances state benefits are recoupable. For example, a recently enacted Pennsylvania statute provides for recoupment of unemployment benefits when back pay has been awarded. Pa.Stat.Ann. tit. 43, Sec. 874(b)(3) (Purdon Supp.1982).[3]
 
 
 32
 The collateral benefits rationale was one of the bases for the Supreme Court's decision in Gullett Gin. The Court expressly categorized unemployment compensation benefits as "collateral", and stated that "failure to take them into account in ordering back pay does not make the employees more than 'whole' as that phrase has been understood and applied." 340 U.S. at 364-65, 71 S.Ct. at 340 (footnote omitted). The Court explained that "[s]ince no consideration has been given to collateral losses in framing an order to reimburse employees for their lost earnings, manifestly no consideration need be given to collateral benefits which employees may have received." Id. at 364, 71 S.Ct. at 339.
 
 
 33
 In Gullett Gin, the Court also rejected the employer's argument that unemployment benefits are direct rather than collateral benefits because they are financed partially through employer taxation. The Court stated:
 
 
 34
 Payments of unemployment compensation were not made to the employees by respondent but by the state out of state funds derived from taxation. True, these taxes were paid by employers, and thus to some extent respondent helped to create the fund. However, the payments to the employees were not made to discharge any liability or obligation of respondent, but to carry out a policy of social betterment for the benefit of the entire state.
 
 
 35
 340 U.S. at 364, 71 S.Ct. at 340.
 
 
 36
 (4) A rule precluding deduction of unemployment benefits from a back pay award would further the two key objectives of Title VII's back pay provision, which have been described by the Supreme Court as primarily to end employment discrimination and secondarily to compensate injured victims in a make whole fashion. See Ford Motor Co. v. EEOC, --- U.S. ----, 102 S.Ct. 3057, 3063-64, 73 L.Ed.2d 721 (1982); Albemarle Paper Co. v. Moody, 422 U.S. at 421, 95 S.Ct. at 2373.
 
 
 37
 In Albemarle, the Court described the "obvious connection" between the prophylactic purpose of ending discrimination and the back pay provision as follows:
 
 
 38
 If employers faced only the prospect of an injunctive order, they would have little incentive to shun practices of dubious legality. It is the reasonably certain prospect of a backpay award that "provide[s] the spur or catalyst which causes employers and unions to ... self-evaluate their employment practices and to endeavor to eliminate ... the last vestiges of an unfortunate and ignominious page in this country's history."
 
 
 39
 Id. at 417-18, 95 S.Ct. at 2371-2372 (quoting United States v. N.L. Industries, Inc., 479 F.2d 354, 379 (8th Cir.1973)). To the extent that a back pay award is reduced by unemployment benefits, this purpose is diluted.
 
 
 40
 The above considerations persuaded the Eleventh, Ninth, and Fourth Circuits to reach the conclusion that unemployment benefits should not be deducted from Title VII back pay awards. The Ninth Circuit reasoned that "disallowance of an offset does not have the detrimental effect of discouraging discharged employees from seeking other work" and that the logical solution to any unwanted "double recovery" was recoupment by state employment agencies. Kauffman, 695 F.2d at 347. The Fourth Circuit concluded, " '[A]wards of back pay under Title VII should not be affected by a system of compensation which is designed to serve a wholly independent social policy.' To decide otherwise would undercut to some degree the corrective force of a Title VII back pay award." Ford Motor, 645 F.2d at 196 (quoting opinion below).
 
 
 41
 Finally, and most recently, the Eleventh Circuit decision, in an in banc decision, rejected the earlier contrary Fifth Circuit precedent and stated, "We now hold as a matter of law that unemployment compensation benefits received from a state fund, even if supported by a tax on employers, may not be deducted from a Title VII back pay award ...." Brown v. A.J. Gerrard Manufacturing Co., 715 F.2d at 1550.
 
 
 42
 We recognize that because back pay is itself considered a discretionary remedy, it may be argued that deduction of unemployment compensation should be left to the discretion of the district court. This is essentially the position taken in Chief Judge Seitz' dissenting opinion and by those circuits which have upheld deduction of unemployment benefits.
 
 
 43
 While this approach has some attraction, we find it essentially inconsistent with the language in the Albemarle opinion which suggests a duty on the part of appellate courts to fashion uniform rules where necessary to further the statutory objectives:
 
 
 44
 The courts of appeals must maintain a consistent and principled application of the backpay provision, consonant with the twin statutory objectives, while at the same time recognizing that the trial court will often have the keener appreciation of those facts and circumstances peculiar to particular cases.
 
 
 45
 422 U.S. at 421-22, 95 S.Ct. at 2373 (emphasis added). See also Brown v. A.J. Gerrard Manufacturing Co., 715 F.2d at 1551.
 
 
 46
 The award of back pay is not left to the unbridled discretion of the trial court but instead has been made the presumptive remedy for unlawful employment discrimination, see Gurmankin v. Costanzo, 626 F.2d 1115, 1120-21 (3d Cir.1980), cert. denied, 450 U.S. 923, 101 S.Ct. 1375, 67 L.Ed.2d 352 (1980) (applying Albemarle rationale in a Sec. 1983 case), because such a decision implicates legal and policy considerations. Similarly, resolution of the deductibility question requires "the principled application of standards consistent with those purposes and not 'equity [which] varies like the Chancellor's foot' ". Albemarle, 422 U.S. at 417, 95 S.Ct. at 2371.[4] Accordingly, appellate guidance on this issue will avoid the conflicting results reached when such an issue is left to the discretion of the district courts, which may differ in their individual resolution of the legal and policy questions. Compare, e.g., Kyriazi v. Western Electric Co., 476 F.Supp. 335, 339 (D.N.J.1979) (unemployment benefits must be deducted), with Helbling v. Unclaimed Salvage & Freight Co., 489 F.Supp. 956, 963 (E.D.Pa.1980) (deduction is "permissible").
 
 
 47
 In summary, we adopt the rule of nondeductibility of unemployment benefits because we conclude that the legislative history and Gullett Gin are persuasive, that the primary prophylactic policy of Title VII would thereby be better served, that the rule would foster uniformity in applying the back pay remedy, and that the recoupment of unemployment benefits by the state is the better way of dealing with any possible unfairness as between the state and recipient.
 
 IV.
 Conclusion
 
 48
 For the foregoing reasons, we will affirm the judgment of the district court for Craig on liability, and we will reverse so much of its judgment on damages as requires the deduction of unemployment compensation benefits from the back pay award.
 
 SEITZ, Chief Judge, dissenting in part:
 
 49
 I fully agree with the majority that the district court correctly found the defendant liable under Title VII and that an award of back pay was an appropriate remedy. I dissent from part III of the opinion, however, because I do not agree that unemployment compensation may never be deducted from a back pay award under Title VII.
 
 
 50
 One of the purposes of a back pay award is to deter future discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 417-18, 95 S.Ct. 2362, 2371-2372, 45 L.Ed.2d 280 (1975). A second purpose is to place the victim of discrimination in the same position as if the discrimination had not occurred. Id. at 418-20, 95 S.Ct. at 23722373. Thus, Congress has determined that the economic sanction contained in a make-whole remedy is a sufficient deterrent to future discrimination. "[B]ack pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice." Robinson v. Lorillard Corp., 444 F.2d 791, 804 (4th Cir.1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 665 (1971). Since the plaintiff is only entitled to reimbursement for her economic loss, and the back pay award has no punitive character, the collateral source rule does not apply and does not compel the partial double recovery here. See Restatement (Second) of Torts Secs. 901, 920A and comment b (1977) (theory of tort damages generally and collateral source rule in particular includes punitive aspect).
 
 
 51
 The plaintiff's "tangible economic loss" has already been partially offset by her unemployment benefits. In my view the deterrent purpose of Title VII does not require that the victim of discrimination be compensated again for that portion of the economic loss already offset. As Judge Oakes noted, writing for the Second Circuit on this same issue, "we are not in the business of redistributing the wealth beyond the goal of making the victim of discrimination whole." EEOC v. Enterprise Association Steamfitters Local 638, 542 F.2d 579, 592 (2 Cir.1976), cert. denied, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977). The majority holds that deducting unemployment benefits gives a windfall to the employer because it reduces the damages which he would otherwise have to pay. However, by providing only a make-whole remedy Congress has made the windfall issue irrelevant. The remedy is measured by the amount needed to make the plaintiff whole, and only if the employer paid less than that amount would there be a windfall. There is no suggestion that plaintiff has not been made whole by the district court's order.
 
 
 52
 Prior case law under both Title VII and the NLRA does not compel a rule that unemployment benefits may never be deducted from an award of back pay. All that the Supreme Court held in Gullett Gin was that it was within the NLRB's discretion not to deduct unemployment benefits from an award of back pay. 340 U.S. at 364, 71 S.Ct. at 339-340. Since Title VII was modeled on the NLRA, presumably deductions are similarly discretionary under that statute as well. The majority further notes that discretion under the NLRA is broad enough to permit the NLRB to deduct interim earnings from back pay awards although the statute is silent on deductions. Relying again on the similarity between Title VII and the NLRA, I cannot agree with the majority that the absence of specific language in Title VII authorizing deduction of unemployment benefits from back pay awards means that such a deduction is impermissible. As Senator Harrison Williams commented, "the provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible." 118 Cong.Rec. 7168 (1972).
 
 
 53
 My disagreement with the majority is not over the purposes of Title VII, but with how those purposes--deterrence of further discrimination and making victims whole--are to be effectuated. I believe that Congress has determined that compelling an employer to make victims of discrimination whole will deter the employer from future similar acts. The employer cannot be compelled to pay more damages than this, however much greater the deterrent effect of such a payment might be.
 
 
 54
 Some additional deterrent is contained in the unemployment insurance statutes of Pennsylvania, New Jersey and Delaware. These statutes have provisions which increase the employer's contributions to the fund based on benefits paid to his employees in a previous year. The decision to discharge an employee is not free of economic cost. We may not go beyond this deterrent and that of a make-whole back pay award, however, without leaving the provisions of Title VII and actively redistributing wealth. My unease at this result is not mitigated by the Pennsylvania recoupment statute, 43 Pa.Stat.Ann. Sec. 874(b)(3) (Purdon Supp.1982). While this statute may prevent the victim from enjoying a partial double recovery, under the majority's rule the employer is still left in the position of paying more than a make-whole sum. In addition, similar statutes are not in effect elsewhere in this circuit.
 
 
 55
 Finally, I agree with the majority that it would be desirable to fashion a rule which would minimize conflict among the district courts as to whether unemployment benefits should be deducted. The rule which I propose would provide that uniformity. A district court reading Title VII as I do would have to deduct unemployment benefits from a back pay award, except in rare circumstances which I cannot readily envision. I do not believe that such circumstances exist in this case. I would therefore affirm the judgment of the district court.
 
 
 
 *
 Hon. H. Lee Sarokin, United States District Judge for New Jersey, sitting by designation
 
 
 [1]
 In Ostapowicz v. Johnson Bronze Co., 541 F.2d 394 (3d Cir.1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977), we affirmed a back pay award in which the district court had deducted unemployment compensation benefits. However, the issue before the court was the employer's challenge to the back pay formula adopted by the district court, and it appears that the question of the deduction was neither raised nor decided. In our later decision in Rodriguez v. Taylor, 569 F.2d 1231, 1243 n. 23 (3d Cir.1977), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), we declined "to pass [ ] judgment on the wisdom" of the Fifth Circuit's ruling in Marshall v. Goodyear Tire & Rubber Co., 554 F.2d 730 (5th Cir.1977), which had affirmed an ADEA judgment that deducted unemployment compensation benefits from a back pay award. Instead we merely contrasted deduction of earned income, which we held must be set off, with collateral benefits, such as unemployment compensation, as to which we noted our silence
 
 
 [2]
 Chief Judge Seitz, in his dissent on this issue, states that the back pay award has no punitive character. To the contrary, Justice Powell, in an opinion joined by Justice Rehnquist, described back pay as "serv[ing] to work complete equity by penalizing the wrongdoer economically at the same time that it tends to make whole the one who was wronged." Franks v. Bowman Transportation Co., 424 U.S. 747, 787, 96 S.Ct. 1251, 1275, 47 L.Ed.2d 444 (1976) (emphasis added) (concurring and dissenting)
 
 
 [3]
 The statute became effective July 10, 1980 and appears on its face to be inapplicable to Craig, who received her benefits before that date
 
 
 [4]
 As with back pay, there may be a place for a "particular circumstances" judgment as to deductibility, but no particular circumstances are suggested in this record