

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-22-2003

# Hare v. H&R Ind Inc

Precedential or Non-Precedential: Non-Precedential

Docket 02-1996

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Hare v. H&R Ind Inc" (2003). *2003 Decisions.* Paper 540.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/540

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

Nos. 02-1996 / 02-2487 / 02-3284

———————

PRISCILLA HARE,

Appellant (No. 02-2487)

v.

H & R INDUSTRIES, INC.,

Appellant (Nos. 02-1996 / 02-3284)

———————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 00-cv-04533)
District Judge: Honorable James McGirr Kelly

———————

Submitted Under Third Circuit LAR 34.1(a)
March 10, 2003

Before: RENDELL, AMBRO  and MAGILL*, Circuit Judges

(Opinion filed : May 22, 2003 )

———————

OPINION

———————

*Honorable Frank J. Magill, United States Court of Appeals for the Eighth Circuit, sitting by
designation.

AMBRO, Circuit Judge

Priscilla Hare brought this lawsuit against her former employer, H & R Industries, Inc., alleging sexual harassment and retaliatory conduct in violation of Title VII of the Civil Rights Act of 1964. After a bench trial, the District Court entered judgment in favor of Hare. H & R challenges the Court's decisions holding the company liable and setting the amount of damages and attorney's fees. Hare also challenges the amount of damages awarded. We affirm the District Court's rulings in all respects.

BACKGROUND

"In sexual harassment cases, where there are frequently serious credibility issues, we are bound to accept the trial court's findings, as we are in all Title VII cases, unless they are clearly erroneous." *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 79 (3d Cir. 1983). We set out the facts found by the District Court, doing so in some detail because of the fact-intensive nature of the inquiry. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").

Hare worked as a machinist at H & R from February 1997 to October 1999, when the company terminated her employment. The District Court found that Hare was subject to a sexually hostile work environment during her employment at H & R because the "workplace was permeated with discrimination, ridicule, and insult." More specifically, and among other things: James Michael ("Mick") Jones, H & R's general manager, would put his arm around Hare, squeeze her cheeks, and call her "gorgeous." An H & R department inspector, Mike Cheatly, would tickle Hare when she worked on her machine, one time causing her almost to cut off her

2

finger.  He would also approach her with his hands open as if to grab her breasts.  Hare's immediate supervisor, David Wolfgang, told Hare personal information about his wife and displayed pornography to other workers on his company computer.  He brought the pornography into the workplace because he wanted to see it on a bigger monitor.[1]

A co-worker, Kevin Webster, would chase Hare around the machines, grab her buttocks, and told her he would "bend [her] over [a] railing" in the office and that eventually the two would sleep together.  Bruce Elton, another H & R inspector, saw Webster chase Hare around the machines, put his hands on her, and pinch her buttocks.  Elton heard Webster whistle at Hare, call her "Blondie," and, when Hare was bending over her machine, tell her, "Hold it right there."

Co-worker Bob Biro spent a lot of time around Hare's machine, would put his arms around her, and asked her if she was bisexual or had a boyfriend.  Co-worker Igor (last name not provided) put a note on Hare's desk telling her she would be worth a couple thousand dollars on the Russian market.  Co-worker Greg Keller told Hare that her perfume was giving him an erection.  Hare was called "like a dog" by co-workers and called names, such as "airhead," "my little hamhock," and "baby."

A drawing of a naked woman that was supposed to be Hare was passed around the office. Wolfgang (Hare's immediate supervisor) asked who was responsible for the drawing, but no one admitted to it.  No warnings were given, no disciplinary action was taken, and no record was made that the incident occurred.

---

[1] The District Court did not address in its opinion Hare's testimony that Wolfgang asked Hare to go away with him on two occasions when he was having problems with his wife.  Wolfgang testified that he brought a gift to Hare at her house and called her there as well.

Hare complained to Wolfgang during her employment about harassing behavior directed toward her. He spoke to Jones (the general manager) about Hare's complaints and acted in response to Jones' suggestions. Wolfgang spoke to the male employees in Hare's department, who admitted the behavior but said it was not a "big deal." Wolfgang did not write down anything about Hare's complaints, what the men had said to him, or what action he took. He told Hare to "give it back."

H & R's owner, Harry Schmidt,[2] believed that Wolfgang questioned employees about Hare's complaints and told them to stop the behavior about which she complained. It did stop for a while, but then started again. Harry Schmidt did not know what else the company could be expected to do.

Rumors circulated around the office that Hare was having an affair with more than one other employee. Hare complained to Jones about a rumor that she and Wolfgang were having an affair, and Jones also heard about this rumor from Cheatly (the department inspector). Jones discussed the rumor with Harry Schmidt. Schmidt had also heard that Wolfgang gave Hare greeting cards and gift. Jones asked Wolfgang if the rumor were true. Wolfgang denied it. Management did nothing else about the matter.

Harry Schmidt also heard from Jones, or as a rumor in the plant, that Hare and Joe Kroliczak (a co-worker) were involved in an affair. Kroliczak denied the rumor, and Schmidt did nothing else about it. Cindy Kroliczak, Joe Kroliczak's wife, believed that her husband and Hare were having an affair. When Hare was returning from lunch on the Friday before her

---

[2] Although generally using only last names after the initial introduction of the cast of characters, we will refer to Harry Schmidt by his full name in order to distinguish him from Gary Schmidt, his son, whom we mention later.

termination, she and Cindy Kroliczak engaged in "a loud obscene shouting match" in the H & R employee parking lot, and Hare "continued to use loud vulgar language inside the plant." The following Monday, October 18, 1999, Hare was fired.

After her termination, Hare twice attempted suicide. She was hospitalized for short periods due to her psychological condition and also received out-patient counseling.

Hare brought this suit alleging sexual harassment and retaliation in violation of Title VII, 42 U.S.C. §§ 2000e-2, -3, and a state law claim of intentional infliction of emotional distress. After a bench trial, the District Court in an order issued March 11, 2001, held in favor of Hare on all claims. The Court awarded Hare back pay, medical expenses, and punitive damages, totaling $75,708.37. Both parties moved the Court to amend the March 11 order, and on April 29, 2002, the Court issued a second order explaining its denial of both motions. Lastly, on July 18, 2002, the Court ordered H & R to pay Hare attorney's fees in the amount of $76, 311.50.

Both parties timely appealed from various decisions in the three orders issued by the Court.

RETALIATION

H & R challenges the District Court's holding that the company terminated Hare's employment as an act of retaliation for the complaints of sexual harassment she made during her employment. To prove illegal retaliation under Title VII, a "plaintiff first must establish a prima facie case of retaliation: [she] must show that (1) [she] was engaged in protected activity; (2) [she] was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge. . . . If the plaintiff succeeds, the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory

5

reason' for its actions." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 & n.2 (3d Cir. 1997) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The defendant must only articulate, not prove, such a reason, and if it does so, "the presumption of discrimination drops from the case. To prevail at trial, the plaintiff must convince the factfinder 'both that the reason was false, and that discrimination was the real reason.'" *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 512 (1983)).

H & R argues first that Hare did not complain of sexual harassment prior to her termination and therefore did not engage in a protected activity as required to meet the first prong of a retaliation claim. But the District Court did not clearly err in finding that Hare complained on a regular basis to Wolfgang about such behavior, and also that Wolfgang discussed Hare's complaints with Jones (the general manager), and that Harry Schmidt (H & R's owner) knew of Hare's complaints. Further, the parties agree that on the Friday before her termination Hare complained to Gary Schmidt (Harry Schmidt's son) about the rumor of an affair between her and Joe Kroliczak that led to the confrontation with Cindy Kroliczak. Accordingly, Hare engaged in protected activity prior to her discharge. And Hare's "termination clearly establishes the second prong" of her retaliation claim. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.4 (3d Cir. 2000).

We do not distinguish between whether Hare made out the third prong of her *prima facie* retaliation case – a causal link between her complaints and her dismissal – or whether she proved that H & R's articulated reason for her termination – her use of loud and vulgar language after her confrontation with Cindy Kroliczak – was pretextual and that retaliation was the real reason for H & R's decision to terminate her employment. *See id.* at 286 ("The question: 'Did her firing

6

result from her [complaints of harassment]?' is not easily distinguishable from the question: 'Was the explanation given for her firing the real reason?'"). Examining these questions together, we conclude that the District Court reasonably found H & R's explanation for Hare's termination was mere pretext, and that the dismissal was retaliatory.

There are several reasons why this is the case. One is temporal proximity: the fact that H & R fired Hare the first working day after Hare took her complaints directly to one of the Schmidts (rather than to lower-level managerial employees as she had done before) suggests retaliation for those complaints. *See Woodson*, 109 F.3d at 920 ("Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link.").

Additionally, "evidence of condoned harassment can support an inference by the fact-finder that the employe[r], having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff." *Id.* at 922. There was more than sufficient evidence in this case to permit the District Court to conclude that the owner and general manager of H & R, as well as Hare's immediate supervisor, knowingly permitted the hostile work environment of which Hare complained to continue. When Wolfgang, acting under Jones' direction, questioned other male employees at H & R about Hare's complaints, the employees admitted to the conduct Hare alleged. Harry Schmidt testified that other than one time instructing the employees to stop the harassment he did not know what else the company was expected to do to put an end to such behavior. The company did nothing else, and after a brief respite the harassment began again. To make matters worse, Wolfgang and Jones themselves engaged in harassing behavior. Consequently, the District Court could reasonably infer on this ground too that Hare's dismissal

7

came in retaliation for her complaints of condoned harassment.

Finally, we also note that H & R failed to record its reasons for firing Hare and that Hare's employment record did not otherwise reflect any reason for her termination. In light of all of the above and given the District Court's opportunity to adjudge the credibility of the witnesses, we shall not overturn its determination that Hare proved by a preponderance of the evidence that a retaliatory motive drove the company's decision. We therefore affirm the Court's conclusion that H & R violated Title VII by firing Hare in retaliation for her complaints of sexual harassment.

## HARASSMENT

H & R further contends that it cannot be held liable for the harassment inflicted on Hare by its employees. In a hostile work environment sexual harassment case, however, "if the employer knew or should have known of the harassment and failed to take prompt remedial action, it is liable under Title VII." *See Bonenberger v. Plymouth Township*, 132 F.3d 20, 26 (3d Cir. 1997); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) (speaking approvingly of cases that "held employers liable on account of actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently harassing action by subordinates, which the employer or its informed officers have done nothing to stop"). As discussed above, Harry Schmidt, Jones, and Wolfgang knew that H & R employees sexually harassed Hare, and the District Court did not err in holding that the single, ineffective instruction to the employees to desist from this conduct fails to qualify as "prompt remedial action" such that it will save the company from liability.

H & R further asserts that it should be excused from liability because its company policy

manual on page 4 stated during the relevant time: "Any employee who feels he/she has been or is being sexually harassed is encouraged to report such incidents to management. All complaints will be handled confidentially and impartially." According to H & R, Hare did not report her complaints to "management." But she complained (and often) to her immediate supervisor, Wolfgang, and other co-workers. H & R relies on another section of it Policy Manual, at page 20, that stated: "Your supervisor should be the first person to see when you have a problem, complaint, question or other concern. . . . If you are having a problem with your supervisor, talk to your supervisor's manager." Regardless of the effect these policy statements might otherwise have regarding H & R's liability, in this case H & R's general manager and owner did learn of the harassment when Wolfgang passed along Hare's complaints (and from other sources as well), and the company's failure to take prompt remedial action precludes a defense on the basis of the company's internally publicized complaint procedure.[3]

On the basis of its factual findings, the District Court correctly held H & R liable under Title VII for the hostile work environment created by its employees.[4]

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

---

[3] The District Court further found that Harry Schmidt, Jones, and Wolfgang never received sexual harassment or other sensitivity training and that H & R never provided such training to its employees.

[4] H & R also argues that "the District Court failed to balance the evidence when it concluded" that Hare had proved the existence of an actionable hostile work environment. In so arguing, H & R urges us to make credibility determinations contrary to those made by the District Court. But we must accept the District Court's credibility determinations because they were not clearly erroneous. Doing so, we easily conclude that Hare suffered severe and pervasive harassment sufficient for a finding of discrimination on the basis of a hostile work environment. *See Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001).

9

H & R also argues that the District Court erred in holding the company liable under the

Pennsylvania tort of intentional infliction of emotional distress. This tort requires a showing of

"extreme or clearly outrageous" conduct. *Andrews*, 895 F.2d at 1486-87; *Hoy v. Angelone*, 720

A.2d 745, 753 (Pa. 1998).

The District Court explained why the conduct in this case met the extreme or outrageous

standard:

> Not only did [Hare's] supervisors acquiesce in the harassment, they
> were directly responsible for much of the harassment.
> Furthermore, not only did H & R allow this atmosphere of on-
> going and extreme hostile work environment to continue to exist, it
> actually encouraged it. For example, instead of remedying the
> situation, Hare's supervisor told Hare to "give back."

The retaliatory termination additionally supports the District Court's conclusion. *See Hoy*, 720

A.2d at 754 ("Retaliatory conduct is typically indicative of discrimination of a more severe

nature and usually has a greater detrimental impact upon the victim."). And the Court also found

that Hare suffered emotional distress, relying on the fact that Hare tried to commit suicide and

was admitted to the hospital for psychological care.

Although "it is extremely rare to find conduct in the employment context that will rise to

the level of outrageousness necessary to provide a basis for recovery" under this tort, we will not

second guess the District Court's conclusion, for the reasons just given, that Hare suffered

emotional distress intentionally inflicted by H & R. *Andrews*, 895 F.2d at 1487.

DAMAGES & FEES

1.    Medical Expenses

H & R objects to the District Court's award of medical expenses to Hare, asserting that

Hare's depression, hospitalization, and need for future medical treatment are unrelated to her

work experience. The District Court could, however, reasonably credit, among other evidence, Dr. Donald E. Jennings' testimony that the "primary cause" of Hare's "psychological condition" was "what happened to her at H & R Industries and how that led up to her being terminated from that employment." We therefore shall not disturb the award of medical expenses.

2.      Back Pay

H & R further contests the District Court's award to Hare of back pay for the period from September 9 to December 16, 2000. As H & R points out, after her dismissal Hare obtained employment with another company, which she quit in early September 2000. But given that the District Court reasonably could have found that the harassment Hare suffered at H & R was the "primary cause" of her psychological condition and the fact that Hare attempted suicide in October 2000, the Court also reasonably could have concluded that as the direct result of H & R's discrimination and retaliation Hare could not with "reasonable diligence" maintain other employment in the fall of 2000. 42 U.S.C. § 2000e-5(g)(1). As a result, the Court did not abuse its discretion in awarding back pay for this period. *See id.*[5]

Hare separately appeals the District Court's award of back pay: she contends that the award should have included the period beginning in February 2001 through the start of trial. Hare began working again, however, in December 2000, quitting in February 2001 because the company changed the hours she would work, and, as a result, she no longer could get a ride to

_____

[5] H & R also asserts that the amount of unemployment compensation that Hare received should be subtracted from her damages award. We have previously held, however, that "unemployment benefits should not be deducted from a Title VII back pay award." *Craig*, 721 F.2d at 82. Accordingly, the District Court correctly resolved this issue.

11

work.  Hare reasons that she "could not drive because she lost her license due to a DUI" and that the "DUI occurred because her drinking increased as a result of the hostile work environment."

We agree with the District Court that the connection between H & R's treatment of Hare and Hare's subsequent inability to obtain transportation to her place of employment is too attenuated to support an award of back pay from the time Hare quit this other job.  Again, the District Court did not step outside its proper discretion.[6]

3.     Pain and Suffering

Hare moved the District Court to amend its decision to award her damages for pain and suffering.  The District Court explained that in awarding $50,000 in punitive damages, "the Court took special consideration of the pain and suffering Plaintiff had to endure as a result of Defendant's conduct."  The Court agreed with Hare that damages "for pain and suffering should have been separately noted rather than lumped in with the punitive damage amount," but concluded that "as the total amount of award remains the same, the Court [would] decline[] to modify the award."  The District Court did, therefore, award pain and suffering damages, and we see no abuse of discretion in the amount of that award.[7]

---

[6] Hare also argues that the District Court should have awarded her front pay because "Dr. Jennings testified and the Court accepted in Finding of Fact # 49 that [Hare] cannot return to a machine job ever."  Finding of Fact # 49, however, states: "Dr. Jennings also testified that with 3 to 6 months treatment, [Hare] would be able to return to a non-machine job."  This statement does not mean that the Court found that Hare could not ever return to a machine job.  Consequently, we reject Hare's argument and have no reason to consider whether the District Court would have abused its discretion by refusing to award front pay if the Court had made the factual finding Hare attributes to it.

[7] Hare further contends that the District Court erred by considering certain damages to be compensatory damages.  She has not, however, cited any legal authority to support her argument.  And although the total damage award was well below what she argues is the

12

4.      Attorney's Fees

H & R requests that we remand for the District Court to require Hare's attorney to submit her original time records and, thereafter, to reconsider the award of attorney's fees. As the District Court explained, Hare's attorney records her daily work activity on a single sheet of paper regardless of the number of clients for which she worked that day. At the end of the day, a member of her staff enters into a computer program the time listed for the cases noted, and the original sheet of paper is destroyed. Accordingly, Hare's attorney submitted the computer-generated records of her time, rather than the original paper copies.

H & R contends that viewing the original time sheets would enable it better to object to issues such as whether time billed was for legal work, travel, or administrative responsibilities like sending faxes. Using the computer-generated records, however, the District Court already reduced from the amount of attorney's fees requested time spent for such activities. As to the issues raised by H & R, therefore, the Court necessarily found the computer records sufficiently specific for purposes of determining the fee award. *See Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1038 (3d Cir. 1996) ("[C]omputer-generated summaries of time spent by [the] attorney" can meet the specificity requirement for establishing attorney's fees.) (quoting *Keenan v. City of Philadelphia*, 983 F.2d 459, 473 (3d Cir. 1992)).

The District Court acted well within its discretion in awarding attorney's fees on the basis of the computer-generated time records submitted by Hare's counsel.

CONCLUSION

statutory cap on compensatory damages, she has not explained how any error could have affected the amount of damages she received. We therefore will not remand for reconsideration of this issue.

The District Court did not clearly err in its factual findings, and on the basis of those findings the Court correctly held H & R liable for sexual harassment and retaliation in violation of Title VII. The Court also acted within its discretion in its award of back pay, medical expenses, and punitive damages. We affirm in all respects.

_____

TO THE CLERK:

Please file the foregoing Opinion.

By the Court,

/s/ Thomas L. Ambro
Circuit Judge

14